Gerard C. MENICHINI, t/a
Best Legal Services,

v.

Lissa L. GRANT; Mellon Bank (East),

Mellon Bank (East) National
Association, Appellant.

No. 92–1380.

United States Court of Appeals,
Third Circuit.

Argued Jan. 11, 1993.

Decided June 7, 1993.

---

Daniel S. Bernheim (argued), Patterson & Weir, Philadelphia, PA, for appellant.

Ivan Wille (argued), Law Offices of Ivan Wille, Huntingdon Valley, PA, for appellee Gerard C. Menichini, t/a Best Legal Services.

Before HUTCHINSON, SCIRICA and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this diversity suit, Gerard C. Menichini t/a Best Legal Services alleges Mellon Bank converted his property by accepting checks embezzled by Menichini's employee Lissa Grant. Two issues are presented on appeal: (1) whether the Pennsylvania Supreme Court would apply the tolling principle known as the "discovery rule" where an innocent party, i.e. a party not engaged in fraudulent concealment, invokes the statute of limitations as a defense to a check fraud action; and (2) whether Menichini negligently facilitated Grant's forgeries. The district court applied the discovery rule, concluded Menichini was not negligent, and granted judgment in Menichini's favor. Because we believe the Pennsylvania Supreme Court would refuse to apply the discovery rule in these circumstances, and because we believe Menichini negligently facilitated his employee's forgeries, we will reverse and remand.

## I.

Menichini founded Best Legal Services in 1981 as a sole proprietorship[1] providing various nonprofessional support services to attorneys and law firms. In 1986 Menichini hired his first full-time employee, law student Lissa Grant, as receptionist. In time, Menichini entrusted Grant with greater responsibilities, such as opening and receiving mail, sending invoices to clients, overseeing billing, recording checks, helping acquire new business, and assisting in client relations. Grant eventually became Best's bookkeeper and office manager. After Best installed a computer accounting system, Grant became exclusively responsible for recording invoices and payments.

Although Grant prepared deposit slips for Best's accounts, Menichini made all bank deposits, indorsing checks with a rubber stamp which bore Best's name, account number, and the designation "FOR DEPOSIT ONLY—JEFFERSON BANK." The rubber stamp was kept locked in his desk drawer. Although Grant occasionally used the stamp under Menichini's supervision, he never authorized her to sign his name or to indorse checks made out to Best.

Grant proved an unfaithful guardian. From April 4, 1988 to December 22, 1989, Grant intercepted 150 checks made out to Best, depositing them in her personal account at Mellon Bank after printing "Pay to the Order of Lissa Grant" or "Pay to Lissa Grant" on the reverse side of the check, under which she forged Menichini's signature. After signing her name and personal account number under the forged signature, Grant deposited the checks into her personal account at Mellon Bank through "remote" automatic teller machines, i.e., ATMs not physically connected to a Mellon branch office. Mellon Bank accepted the instruments for deposit, presented them to the various drawee banks, accepted payment for the checks from those banks, and credited payment to Grant's account.

Grant's bookkeeping responsibilities gave her access to Best's mail and billing process, enabling her to conceal her embezzlement for twenty months. Under her scheme, Grant invoiced certain customers without recording the invoice in the company's accounts receivable. Then she intercepted the incoming checks and deposited them in her personal account at Mellon Bank. Although Menichini and his accountants periodically reviewed Best's financial records, Grant's deceit kept them from discovering her actions. When Grant prepared the business records for the

1. Best later incorporated.

accountants, she expunged any inculpatory information.

Grant's deceitful practices came to light on December 22, 1988, when another employee observed her entering a check payable to Best on a deposit slip to her personal account at Mellon Bank. After being apprised, Menichini spoke to Mellon Bank's branch manager the next business day. When the branch manager told him bank policy shielded Grant's account, Menichini contacted clients in order to obtain copies of canceled checks paid to Best.

On January 8, 1990, Menichini and his attorney confronted Grant. Grant confessed and acknowledged that she had not kept records of the invoices to or payments from clients whose checks she had misappropriated. Working together, Menichini and Mellon Bank calculated Grant had stolen 150 checks totalling $61,431.98.

On December 21, 1990, Menichini t/a Best Legal Services filed this diversity action, alleging defendants Grant and Mellon Bank converted Best's property. Default judgment was entered against Grant. After a bench trial, the district court granted judgment in favor of Menichini against Mellon Bank in the amount of $61,431.98. Mellon Bank appeals.

## II.

██ The district court had jurisdiction under 28 U.S.C. § 1332 (1988) and we have jurisdiction under 28 U.S.C. § 1291. The parties agree Pennsylvania law controls the resolution of this dispute.[2]

The district court's findings of fact are subject to the clearly erroneous standard, and its conclusions of law are subject to plenary review. *Martin v. Selker Bros. Inc.,* 949 F.2d 1286, 1293 (3d Cir.1991).

## III.

Menichini sued Mellon Bank for conversion under § 3–419 of the Pennsylvania Uniform Commercial Code. Section 3–419(a) codifies the tort of conversion: "An instrument is converted when: .... (3) it is paid on a forged indorsement." Mellon Bank raised two defenses: on the 1988 forgeries, it interposed Pennsylvania's two-year statute of limitations; on the 1989 forgeries, Mellon Bank asserted Menichini's negligence barred recovery under the Code.

### A.

### The 1988 Forgeries

██ Menichini filed suit on December 21, 1990. If applicable, the two-year statute of limitations would bar Menichini's claims on the 1988 forgeries.[3] At issue is whether, in a case involving conversion of negotiable instruments, the "discovery rule" applies when a party not engaged in fraudulent concealment invokes the statute of limitations.[4] The Pennsylvania Supreme Court has not answered this question. Relying on *Pocono International Raceway, Inc. v. Pocono Pro-*

---

2. As a federal court exercising diversity jurisdiction, we are obliged to apply state substantive law which includes statutes of limitations. *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 552 (3d Cir.1985).

3. There is some confusion as to the amount embezzled (and potentially time-barred) in 1988. Although the district court believed the amount potentially time-barred was $3,608.05, this figure apparently concerned an amount for which Menichini had deposit slips but no accompanying checks. The record indicates Grant misappropriated $9,675.20 during 1988 and $48,148.73 during 1989. At oral argument counsel for Mellon Bank stated the stipulated amount was $9,675.20.

4. The discovery rule is an equitable exception to the general rule that the statute of limitations begins to run as soon as the underlying cause of action accrues. *See Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir.1991). Under the general rule "lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 85, 468 A.2d 468, 471 (1983). The discovery rule, which "arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause," *id.,* provides that "the statute of limitations begins to run as soon as 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" *Bohus,* 950 F.2d at 924 (citing *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 136–37, 471 A.2d 493, 500 (1984) (in banc)) (footnote omitted).

*duce, Inc.,* 503 Pa. 80, 468 A.2d 468 (1983), the district court predicted the Pennsylvania Supreme Court would apply the discovery rule and held that "it was not plaintiff's lack of diligence, but defendant's fraudulent concealment of the wrong that prevented plaintiff from asserting his rights at an earlier date." Because Menichini did not discover the misappropriation until December 22, 1989, the district court concluded the statute of limitations did not time-bar recovery of losses attributable to the 1988 forgeries.

■ Because the UCC does not specify a statute of limitations for conversion of negotiable instruments,[5] we must look elsewhere for an appropriate statute. *See* 13 Pa.Cons. Stat.Ann. § 1103 (1984) (supplementary general principles of law applicable to commercial transactions). The applicable Pennsylvania statute specifies a two-year limitations period. 42 Pa.Cons.Stat.Ann. § 5524.[6]

The district court believed the Pennsylvania Supreme Court's decision in *Pocono International Raceway,* supported application of the discovery rule. We disagree. First, *Pocono* did not involve negotiable instruments and did not address the important UCC policies of negotiability, finality, and uniformity. Second, we do not view this case as an instance of "blameless ignorance" but rather a situation where Menichini ignored

an obvious risk with predictable consequences. Finally, the district court's reasoning that "defendant's fraudulent concealment of the wrong ... prevented plaintiff from asserting his rights at an earlier date," rests on an equivocation in the word "defendant's." If "defendant's" referred to Mellon Bank, it would be decisive. However, it is undisputed that the only defendant engaging in concealment was Grant, not Mellon Bank.

The parties have not cited, and we have not found, any Pennsylvania cases applying the discovery rule to a case of check fraud. Faced with a question of first impression involving the UCC, Pennsylvania courts look to other jurisdictions for guidance. *See Commonwealth v. National Bank & Trust Co.,* 469 Pa. 188, 194, 364 A.2d 1331, 1335 (1976) (sister states' decisions "entitled to even greater deference where consistency and uniformity of application are essential elements of a comprehensive statutory scheme like ... the. Uniform Commercial Code"); 1 Pa.Cons.Stat.Ann. § 1927 ("[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them").

Although a few courts apply the discovery rule to negotiable instrument theft on essentially equitable grounds,[7] the tide of case law runs strongly against this approach.[8] Where

---

5. On July 9, 1992, the Pennsylvania legislature approved, to take effect one year thereafter, the "Uniform Commercial Code Modernization Act," embodying the revisions and amendments to Articles 3 and 4 made by the National Conference of Commissioners on Uniform State Laws and the American Law Institute. 1992 Pa.Legis.Serv. 383–522 (Purdon); *see generally, Symposium: Revised Articles 3 & 4 and New Article 4A,* 42 Ala.L.Rev. 351 (1991). The Revised UCC (RUCC) includes, *inter alia,* a three-year statute of limitations for conversion, RUCC § 3–118(g)(1), and a loss allocation provision dealing specifically with employer responsibility for fraudulent indorsement by an employee, RUCC § 3405. RUCC § 3–118 leaves tolling issues to other law. *See* Unif. Commercial Code, § 3–118 cmt. 1, 2 U.L.A. 45 (1991) ("the circumstances under which the running of a limitations period may be tolled is left to other law pursuant to Section 1–103").

6. 42 Pa.Cons.Stat.Ann. § 5524 provides:
The following actions and proceedings must be commenced within two years: .... (3) An action for taking, detaining ·or injuring personal

property, including actions for specific recovery thereof.... (7) Any other action or proceeding to recover damages for injury to person or property which is founded upon negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud....

7. *See DeHart v. First Fidelity Bank, N.A. S. Jersey,* 67 B.R. 740, 743–46 (D.N.J.1986); *Stjernholm v. Life Ins. Co. of N. Am.,* 782 P.2d 810, 811–12 (Colo.App.1989); *cf. Branford State Bank v. Hackney Tractor Co., Inc.,* 455 So.2d 541, 542 (Fla.Dist.Ct.App.1984) (per curiam) ·(discovery rule applied in Article 9 context).

8. *See, e.g., Kuwait Airways Corp. v. American Sec. Bank, N.A.,* 890 F.2d 456, 460–63, 466 (D.C.Cir. 1990); *First Investors Corp. v. Citizens Bank, Inc.,* 757 F.Supp. 687, 690–92 (W.D.N.C.1991), *aff'd mem.,* 956 F.2d 263 (4th Cir.1992); *Husker News Co. v. Mahaska State Bank,* 460 N.W.2d 476, 477–78 (Iowa 1990); *Wang v. Farmers State Bank of Winner,* 447 N.W.2d 516, 518–19 (S.D.1989); *Fuscellaro v. Industrial Nat'l Corp.,* 117 R.I. 558,

a party not engaging in fraudulent concealment asserts the statute of limitations defense, most courts have refused to apply the discovery rule to negotiable instruments, finding it inimical to UCC policies of finality and negotiability. The Iowa Supreme Court's analysis in *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476 (Iowa 1990), illustrates this approach. There, on similar facts, the court refused to apply the discovery rule to a § 3–419 conversion action based on a forged indorsement. Plaintiff Husker's employee, Hopf, collected customer payments, forged Husker's indorsement on the checks, and deposited the funds into his personal account. Hopf concealed his embezzlement by "juggling accounts." Husker never saw the forged indorsements because the checks were routed to the various drawee banks through banking channels. Husker did not discover Hopf's defalcations until after Iowa's five-year statute of limitations had run. When the defendant drawee bank interposed the statute of limitations defense to Husker's § 3–419 action, Husker asserted the discovery rule, contending Hopf's fraudulent concealment prevented discovery. Based on the UCC objectives of predictability and finality in commercial transactions, the Iowa Supreme Court refused to apply the discovery rule to the law of commercial paper. Efficiency and the public interest outstripped any countervailing distributional concerns:

> As tempting a choice as that may be in an individual case [i.e. favoring "the rights of unsuspecting victims of forgery over the broader interest of the commercial world"], we think the public would be poorly served by a rule that effectively shifts the responsibility for careful bookkeeping away from those in the best position to monitor accounts and employees. Strict application of the limitation period, while predictably harsh in some cases, best serves the twin goals of swift resolution of controversies

and "certainty of liability" advanced by the U.C.C.

*Id.* at 479. Accordingly, the court held the discovery rule inapplicable to conversion actions under UCC § 3–419(1)(c). *Id.*

The Court of Appeals for the District of Columbia Circuit also endorsed this approach. In *Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456 (D.C.Cir. 1989), it rejected application of the discovery rule to a § 3–419 action. In 1980, Kuwait's employee Sensi, without authorization, opened a checking account in Kuwait's name at American Security Bank and deposited 523 checks payable to Kuwait from which he drew checks payable to family, friends, and associates. Due to various mishaps and Sensi's concealment, Kuwait failed to discover the embezzlement until 1986. The court rejected Kuwait's request to apply the discovery rule to the District of Columbia's three-year statute of limitations, "conclud[ing] that the commercial circumstances presented do not call for application of the discovery rule." *Id.* at 461.

The court reasoned that an ordinary business should have detected the embezzlement within the three-year limitations period. Moreover, the policies of finality in commercial transactions and timeliness of adjudication militated against application of the discovery rule to negotiable instruments absent "fraudulent concealment" by the defendant invoking the defense.

We find this approach convincing and believe it advances the Code objectives of negotiability, finality, and uniformity in commercial transactions. As courts have long recognized, *see, e.g., United States v. First Nat'l Bank*, 131 F.2d 985, 989 (10th Cir.1942), *cert. denied*, 318 U.S. 774, 63 S.Ct. 830, 87 L.Ed. 1144 (1943), the utility of negotiable instruments lies in their ability to be readily accepted by creditors as payment for indebtedness. Checks must be transferable. Conse-

563–64, 368 A.2d 1227, 1231 (1977); *Lyco Acquisition 1984 Ltd. Partnership v. First Nat'l Bank of Amarillo*, No. 07–92–0263–CV, 1993 WL 77278, at *2, —— S.W.2d ——, —— (Tex.Ct.App. Mar. 19, 1993); *Insurance Co. of N. Am. v. Manufacturers Bank of Southfield, N.A.*, 127 Mich.App. 278, 283–84, 338 N.W.2d 214, 216 (1983); *Continental Cas. Co. v. Huron Valley Nat'l Bank*, 85

Mich.App. 319, 325, 271 N.W.2d 218, 221 (1978); *Southwest Bank & Trust Co. v. Bankers Commercial Life Ins. Co.*, 563 S.W.2d 329, 331–32 (Tex.Civ.App.1978); *Gerber v. Manufacturers Hanover Trust Co.*, 64 Misc.2d 687, 688–89, 315 N.Y.S.2d 601, 603 (1970); *Chemical Workers Basic Union v. Arnold Sav. Bank*, 411 S.W.2d 159, 164–65 (Mo.1966) (per curiam) (pre-UCC).

quently, "in structuring the law of checks we ... seek to enhance the negotiability of commercial paper so that it may play its role as a money substitute." Robert Hillman, *et al.*, *Common Law and Equity Under the Uniform Commercial Code*, ¶ 14.01[1] (1985). Negotiability requires predictable and rapid collection through payment channels.

Closely related to negotiability are commercial finality and certainty.[9] "The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial welfare so heavily depends." *Fuscellaro v. Industrial Nat'l Corp.*, 117 R.I. 558, 563, 368 A.2d 1227, 1231 (1977); *cf.* 13 Pa.Cons.Stat.Ann. § 3418 cmt. 1 ("it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered").

Vigorous application of the statute of limitations is a reasonable means of achieving certainty in commercial transactions. Indeed, in the context of bank collections, the Code explicitly mandates "mechanical" application of the statute of limitations notwithstanding the customer's failure to discover a forged indorsement within the relevant limitations period, 13 Pa.Cons.Stat.Ann. § 4406 (placing absolute three-year limitation on a customer's right to bring a breach of warranty action against its bank for wrongfully paying a check over a forged indorsement). The rationale is that "the balance in favor of a mechanical termination of liability of the bank outweighs what few residuary risks the customer may still have." 13 Pa. Cons.Stat.Ann. § 4406 cmt. 5. Here too, in a conversion claim against a party not engaging in fraudulent concealment, the policies of finality and certainty are best achieved by applying the statute of limitations without the discovery rule exception.

The Code drafters sought quick and inexpensive resolution of commercial disputes.[10] This overarching goal is particularly important with negotiable instruments where the exigencies of commerce require inexpensive, quick, and reliable transfer of funds. When the only legally significant temporal events are the time of injury and the time of filing, the issue whether the statute of limitations bars an action becomes a relatively simple determination capable of resolution on the basis of judicial pleadings. Relative to the minority approach, the majority view promises to keep the litigation sword in its sheath.

As a final matter, we note that uniform application of legal principles, of course, is a fundamental objective of the Code. 13 Pa. Cons.Stat.Ann. § 1102(b)(3) ("Underlying purposes and policies of this title are: .... [t]o make uniform the law among the jurisdictions."); 1 Pa.Cons.Stat.Ann. § 1927. We find significant that a clear majority of jurisdictions addressing the issue reject application of the discovery rule to conversion of negotiable instruments.[11]

In sum, we are persuaded that the predominant view is the correct one. Nonapplication of the discovery rule advances fundamental Code policies whereas its application inhibits them. For these reasons we predict that under Pennsylvania law, in the absence of fraud by those invoking the statute of limitations, a cause of action for conversion of negotiable instruments accrues when, irrespective of the plaintiff's ignorance, the defendant wrongfully exercises dominion. As there is no evidence that Mellon Bank en-

9. The payment system's utility depends on readily available funds, requiring and resulting in an increasingly high speed system for check processing. As a consequence, "the need for certain rules in cases involving check fraud is great." *See* Bryan D. Hull, *Common Law Negligence and Check Fraud Loss Allocation: Has Common Law Supplemented or Supplanted the U.C.C.?*, 51 Ohio St.L.J. 605, 612 (1990).

10. 1 Rep. of the Law Rev.Comm'n of the State of New York for 1954 and Record of Hearings on the Uniform Commercial Code 28–36 (1954) (statement to the Law Revision Commission by Karl N. Llewellyn, Chief Reporter of the Code and Member of the Editorial Board).

11. We realize, of course, the absence of a uniform statute of limitations for negotiable instrument conversion actions. However, as jurisdictions adopt the Article 3 revisions the statute of limitations will be a uniform three years. Tolling principles, such as the discovery rule, will be left to supplementary law. *See supra* note 5.

gaged in fraudulent concealment, we will reverse and grant judgment in favor of Mellon Bank on the statute of limitations issue, time-barring relief as to most, if not all, of the 1988 forgeries.

## B.

### The 1989 Forgeries

■ Examination of the 1989 forgeries requires analysis of negligence and loss allocation under the Code. In addressing loss allocation we must decide which innocent party shall bear the loss. Article 3 of the UCC furnishes us with the applicable loss-allocation rules for the check payments. These rules, premised on the responsibility to exercise ordinary care, proceed from the principle that liability rests with the party best able to prevent the loss. *Underpinning & Found. Constructors v. Chase Manhattan Bank,* 46 N.Y.2d 459, 468, 414 N.Y.S.2d 298, 302, 386 N.E.2d 1319, 1323 (1979) ("It is basic to the law of commercial paper that as between innocent parties any loss should ultimately be placed on the party which could most easily have prevented that loss").

Section 3–419 imposes strict liability where a party pays an instrument over a forged

---

**12.** Mellon Bank has not advanced the affirmative defense embodied in § 3–419(c), *D & G Equipment Co. Inc. v. First Nat'l Bank of Greencastle,* 764 F.2d 950, 956 (3d Cir.1985) (§ 3–419(c) constitutes an affirmative defense), nor will we *sua sponte, Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991) (failure to raise affirmative defense generally results in waiver of that defense). Section 3–419(c) provides:

> Subject to the provisions of this title concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

This section and its proper construction have generated enormous controversy. *See generally,* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 15–5 (discussing § 3–419(c)'s limitation of liability on depositary banks and courts' attempt to avoid the liability limitation). Revised § 3–420(c) eliminates current § 3–419(c)'s defense for depositary banks. *See* 1992

indorsement.[12] *Cf.* Restatement of Torts (Second) § 241 A (conversion of negotiable instrument), § 223 (ways of committing conversion) (1965). It is undisputed that Grant's indorsements were unauthorized. *See* 13 Pa. Cons.Stat.Ann. § 1201 (unauthorized signature or indorsement "includes a forgery"). Mellon Bank concedes it paid many checks over forged indorsements and thus is *prima facie* liable as a converter.[13] However, it contends it escapes liability under § 3–406 because Menichini behaved negligently by failing to supervise Grant. 13 Pa.Cons.Stat. Ann. § 3406 (negligence contributing to alteration or unauthorized signature), § 3404 ("Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he … is precluded from denying it"). The district court rejected Mellon Bank's § 3–406 defense, stating: "Mellon Bank must prove that Mr. Menichini was negligent in order to avail itself of the defense codified in section 3–406. This it has failed to do." We believe this issue warrants a different resolution.

### 1. Agency Problems and Revised Section 3–405

■ At the outset we observe that in analyzing the problem of theft by a payee's

---

Pa.Legis.Serv. 448–49 (Purdon); 2 Unif.Commercial Code, § 3–420 cmt. 3, 2 U.L.A. 129 (1991). In light of our analysis of negligence under § 3–406 the same issues will be left on remand as would have been initially had Mellon Bank asserted § 3–419(c)'s defense. On remand Mellon Bank will bear the burden of proving it acted in good faith and in accordance with commercial reasonableness.

**13.** Because the indorsements were made by a thief, no transferee of Grant could be a holder. This follows from the definition of indorsement, "[a]n indorsement must be written by or on behalf of the holder", 13 Pa.Cons.Stat.Ann. § 3202(b), and the definition of a holder as one which must have possession of an instrument "drawn, issued or indorsed to him or to his order or to bearer or in blank", 13 Pa.Cons.Stat.Ann. § 1201. Clearly, the checks were neither payable to nor indorsed to Grant's order. Since Grant lacked holder status and since § 3–202(b) only allows indorsements by those who are holders, Grant lacked the power to make an indorsement. Because no transferee of Grant could be a holder, *a fortiori,* none could be a holder in due course and take free of the true owner Menichini's claim that the instruments had been stolen. 13 Pa.Cons.Stat.Ann. § 3202.

employee we deal with a classic agency problem—i.e., the problem of aligning the agent's interests with the principal's. *See generally,* Alison Grey Anderson, *Conflicts of Interest: Efficiency, Fairness and Corporate Structure,* 25 U.C.L.A. L.Rev. 738 (1978); William C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure,* 3 J. Fin. Econ. 305 (1976). Agency and corporate law seek to reduce aberrant agent activities through principles such as fiduciary duties. *See* Anderson, 25 U.C.L.A. L.Rev., at 762–68. For their part, principals can minimize agency costs not only by measuring or observing the behavior of the agent but also by controlling the agent's behavior through operating rules, compensation policies, budget restrictions and the like.[14] Newly enacted (but yet to take effect) Revised Article 3 recognizes principals' ability to minimize agency costs and resolves the agency problem by assigning check fraud losses to the payee-employer.

Revised § 3–405[15] generally denies an employer the ability to externalize the costs of employee embezzlement, "virtually creat[ing] a bright line making fraudulent indorsements effective against the employer when employees who have 'responsibility with respect to instruments' forge indorsements." John J.A.

Burke, *Loss Allocation Rules of the Check Payment System With Respect to Forged Drawer Signatures and Forged Indorsements: An Explanation of the Present and Revised UCC Articles 3 and 4,* 25 U.C.C.L.J. 318, 371–72 (1993). Revised § 3–405 is premised on the notion that the payee-employer is normally in a better position to prevent fraudulent indorsements by its own employees—through reasonable care in the selection or supervision of employees—than a collecting bank.

### 2. Section 3–406 Defense

▮ Although our analysis proceeds under current § 3–406, it is informed by the judgment that is embodied in newly adopted § 3–405 and supported by leading Code commentators: employers typically have a comparative advantage in preventing diversion of their own property by their own employees. *See, e.g,* James J. White, *Goldstein's Curse,* 21 U.Tol.L.Rev. 599, 617 (1990).

▮ Section 3–406 introduces the fault principle as a defense to § 3–419 conversion liability:

Any person who by his negligence substantially contributes to a material alteration of

---

**14.** Agency law recognizes the principal's ability to control and monitor agent behavior and generally makes the principal liable for those acts performed by its agent in the scope of his employment. *See* Restatement (Second) of Agency §§ 2, 25, 219 (1958).

**15.** Section 3–405's liability rule provides:

(b) Rights and Liabilities. For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

"Fraudulent indorsement" includes "in the case of an instrument payable to the employer, a forged indorsement purporting to be that of the employer." § 3–405(a)(2). "Responsibility" with respect to instruments means authority

(1) to sign or indorse instruments on behalf of the employer;

(2) to process instruments received by the employer for bookkeeping purposes, for deposit to an account or for other disposition;

(3) to prepare or process instruments for issue in the name of the employer;

(4) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer;

(5) to control the disposition of instruments to be issued in the name of the employer; or

(6) to act otherwise with respect to instruments in a responsible capacity.

The term does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail or similar access.

1992 Pa.Legis.Serv. 442 (Purdon). As previously noted, this and other Article 3 revisions become effective in July 1993.

the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the business of the drawee or payor. 13 Pa.Cons.Stat.Ann. § 3406; *see generally,* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 16-2 (3d ed. 1988). Section 3-406 creates a "conditional estoppel" shielding a bank from liability where plaintiff's negligence substantially contributes to the forgery. *Commonwealth v. Nat'l Bank & Trust Co.,* 469 Pa. 188, 191, 364 A.2d 1331, 1333 (1976). The purpose of § 3-406 "is to encourage the free circulation of commercial paper by applying thereto the principle that as between two innocent persons the one who is negligent should bear the loss caused by the wrongdoing of a third person." 6 Ronald A. Anderson, *Anderson on the Uniform Commercial Code,* § 3-406:4, at 189 (1984). As noted earlier, the UCC seeks to discourage fraud by allocating losses to the party whose negligence allowed the scheme to succeed or was in the best position to prevent its occurrence. *Brownlow v. Aman,* 740 F.2d 1476, 1489 (10th Cir.1984) ("[t]he equitable maxim that where one of two innocent persons must suffer by reason of the fraud of a third person, the party whose act, omission, or negligence enabled the third person to consummate the fraud should bear the loss, is a fundamental theory upon which the Uniform Commercial Code rests"). Each § 3-406 case turns on its facts. 13 Pa.Cons.Stat.Ann. § 3406, cmt. 7 ("no attempt is made to specify what is negligence, and the question is one for the court or jury on the facts of the particular case"); Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards,* ¶ 8.02[3], at 8-16 (3d ed. 1990).

■ To invoke § 3-406's conditional estoppel Mellon Bank had to prove: (1) Menichini was negligent; (2) his negligence sub-

stantially contributed to the making of the unauthorized signature; and (3) Mellon Bank acted in good faith and in accordance with reasonable commercial standards. *Jacoby Transp. Sys. v. Continental Bank,* 277 Pa.Super. 440, 447, 419 A.2d 1227, 1231 (1980).

■ Careless business practices constituting failures to take cost-justified precautions give rise to § 3-406 estoppel. *See id.,* at 448-49, 419 A.2d at 1232 (company with checks printed with corporate name in lower right corner without signature line—making them appear signed—negligent); *West Penn Admin. Inc. v. Union Nat'l Bank of Pittsburgh,* 233 Pa.Super. 311, 329-35, 335 A.2d 725, 733-36 (1975) (failure to use a lock-box system for delivery of checks to pension trust funds constitutes negligence; failure to inquire after discovery of irregularity regarding first forged check constitutes negligence).

■ Among other ways, a depositary bank may show employer negligence by demonstrating that the employer negligently (1) hired the perpetrator or (2) failed to supervise the perpetrator's activities or (3) failed to maintain proper internal controls concerning incoming checks or (4) failed to follow up promptly on delinquent accounts receivable or (5) engaged in some combination of the above. Donald J. Rapson, *Loss Allocation in Forgery and Fraud Cases: Significant Changes Under Revised Articles 3 and 4,* 42 Ala.L.Rev. 435, 457 (1991).

Here the record does not disclose whether Menichini inquired into Grant's past employment record or whether such efforts would have alerted him to Grant's past misconduct, if any.[16] *See Fireman's Fund Ins. Co. v. Bank of New Jersey,* 146 A.D.2d 95, 100-01, 539 N.Y.S.2d 339, 342 (1989) (failure to verify employment record negligent where inquiry would have revealed imposter); *G.F.D. Enters., Inc. v. Nye,* 37 Ohio St.3d 205, 213-14, 525 N.E.2d 10, 18 (1988) (negligent failure to verify employment record); *cf.* § 3-405 cmt.

---

**16.** We realize background checks are not foolproof. Even if previous employers terminated an employee for misappropriation, they may not so advise a prospective employer. *See Commercial Credit Equip. Corp. v. First Alabama Bank of*

*Montgomery,* 636 F.2d 1051, 1053 (5th Cir.1981) (previous employer did not reveal employee had been forced to resign due to fraud against previous employer).

4 (padded payroll provision § 3–405(a)(3)) ("The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee").

The record is clear that Menichini entrusted Grant with bookkeeping without instituting internal mechanisms to control or monitor her behavior. Menichini contends it was impossible for him to detect Grant's defalcations because she not only controlled the records for outgoing invoices but also received the incoming checks paying invoices. This argument, however, misconceives Menichini's responsibility by disregarding his role in selecting the bookkeeping system and method of administering receipts. Menichini reposed in a single employee the responsibility to record and send invoices in addition to the responsibility for receiving and recording incoming payments.

The risk of theft posed by an employee solely entrusted with bookkeeping *and* receipt of payments is readily imaginable. The latter responsibility furnishes the opportunity for misappropriation, the former for its concealment. Menichini intermingled Grant's duties without adequate oversight. At trial Menichini conceded that under procedures in effect prior to the defalcations he would have been able to detect and thus prevent Grant's theft by inspection of any of a number of Best's business records, *viz.*, invoices, business ledger, checkbook, deposit slips and reconciliation statements. Another measure would have segregated the responsibilities for billing and receiving incoming checks (a procedure Menichini now follows, matching checks with invoices) or provided periodic investigation and vigilance in assuring proper posting of accounts receivable. None were adopted in this case.

Menichini of course is free to run his business as he chooses. But he cannot reasonably expect to constitute Mellon Bank his fidelity insurer under the circumstances before us.[17] Vis-à-vis Mellon Bank, Menichini had a comparative advantage in preventing Grant's theft. It follows that the fraud loss is more appropriately a cost of Best's doing business, not Mellon Bank's. In light of the obvious risks and the available precautions, we believe combining the responsibilities of bookkeeping with receipt of payments in a single employee—without supervision or any control mechanism—was negligent. We also believe the defalcations are immediately traceable to and would not have resulted but for Menichini's failure to supervise and control his employee's behavior. Menichini's failure to monitor Grant enabled her to steal checks, in excess of her compensation, indeed, in excess of the firm's annual profits. One can fairly conclude that Menichini's antecedent negligence substantially contributed to the defalcations.

---

**17.** Various writers have emphasized the insurance aspect of allocating check fraud losses. A few points are in order. First, we deal here with a commercial entity, not a consumer. *Cf.* Robert D. Cooter & Edward L. Rubin, *A Theory of Loss Allocation for Consumer Payments*, 66 Tex.L.Rev. 63 (1987) (discussing insurance principle in consumer context). Second, "the dominant goal of allocation of bad check losses has historically been prophylaxis—the prevention of loss by encouraging precautions—rather than risk-spreading." E. Allan Farnsworth, *Insurance Against Check Forgery*, 60 Col.L.Rev. 284, 324 (1960). The recent revisions appear to continue this traditional emphasis. *See supra* note 15. Finally, commentators caution against making wealth a dispositive criterion in pinning losses to parties,

Increasingly banks are little more than high-speed mechanical sorters of checks, and drawers or other parties are in much better positions to prevent losses. In such circumstances we should resist the temptation to put the loss on the more wealthy but less culpable and less capable risk avoider. To allocate the loss to the bank in such a case may make the court feel magnanimous, but one should not be misled. Ultimately such allocation diminishes the efficiency of the system either by permitting greater losses than would otherwise occur or by causing banks to spend excess resources to avoid their recurrence.

1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 16–6, at 805 (3d ed. 1988).

### 3. Commercial Reasonableness and Good Faith

■ Mellon Bank has established two of the three requisites for a § 3–406 preclusion defense. However, the district court did not address the issue of commercial reasonableness and Mellon Bank's good faith. Nor shall we. As Mellon Bank concedes, the record before us is insufficiently developed to determine what constitutes reasonable banking practices and whether Mellon Bank adhered to them. Accordingly, we will remand to the district court to develop the record and determine whether Mellon Bank acted in good faith (13 Pa.Cons.Stat.Ann. § 1201) and in accordance with commercially reasonable standards. *See Monaghan v. Provident Nat'l Bank*, 346 Pa.Super. 163, 175–76, 499 A.2d 362, 368 (1985); 1 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 16–7, at 808 (3d ed. 1988); *cf.* 1992 Pa.Legis.Serv. 424, § 3–103(a) ("In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this division or Division 4 (relating to bank deposits and collections")). If Mellon Bank fails to establish that it acted in good faith and in accordance with commercially reasonable standards, the estoppel bar of § 3–406 will prove unavailing and the loss must be allocated to Mellon Bank.

### IV.

For the foregoing reasons, we will reverse the district court's holding that Pennsylvania would apply the discovery rule exception when an innocent party invokes the statute of limitations to bar a § 3–419 conversion suit. We will reverse the district court's determination regarding Menichini's negligence and remand for the purpose of determining whether Mellon Bank acted in good faith and in accordance with commercially reasonable standards.