[No. H012637. Sixth Dist. Nov. 22, 1995.]

JON H. STENSETH, Plaintiff and Appellant, v.
WELLS FARGO BANK, N.A., Defendant and Appellant.

COUNSEL

O'Neal & O'Neal and Jeffrey O'Neal for Plaintiff and Appellant.

A. David Darman and Daniel U. Smith for Defendant and Appellant.

OPINION

MIHARA, J.—Plaintiff Dr. Jon Stenseth filed the instant action against defendant Wells Fargo Bank for allowing plaintiff's employee to cash insurance checks on his forged endorsement. The jury found in favor of plaintiff.[1] On appeal defendant raises issues relating to the admissibility and sufficiency of the evidence. Plaintiff has filed a cross-appeal and contends the trial court erred by excluding evidence of the amount of damages attributable to the time and effort he spent in uncovering the theft. We find the portion of the judgment awarding plaintiff $25,040 in damages must be reversed. In all other respects, the judgment is affirmed.

*Statement of Facts*

Plaintiff is a surgeon who began his practice with a multispecialty organization known as the San Jose Medical Group in 1971. In 1985 plaintiff left the San Jose Medical Group. He then opened a small surgical practice and hired one employee, Della Gray.

Plaintiff had met Ms. Gray at the San Jose Medical Group in the mid-1970's where she was employed in the lab. When plaintiff was planning to leave the San Jose Medical Group, his office nurse recommended Ms. Gray to him. Ms. Gray had previously managed physicians' offices. After plaintiff checked her references and obtained a favorable recommendation, Ms. Gray began working for him on March 4, 1985.

When plaintiff moved his practice, he hired a business consultant who specialized in assisting physicians in setting up their practices. The consultant advised plaintiff as to an appropriate filing system and a bookkeeping

---

[1]The jury awarded damages in the amount of $79,124.68. Judgment was entered reflecting prejudgment interest of $18,286.98 less a setoff of $19,379.50 for a total judgment of $78,036.12.

method necessary to operate the business. The business consultant also arranged a meeting between plaintiff and a Safeguard representative to set up the bookkeeping system. Plaintiff met with the Safeguard representative three to six times. The Safeguard bookkeeping system was explained to both plaintiff and Ms. Gray during one of these meetings. The Safeguard representative never mentioned that one could conceal embezzlement by manipulating this system.

When his solo practice began, plaintiff was in the office "quite a bit of the time" and would perform bookkeeping functions on occasion. However, plaintiff spent much less time on these functions as his practice grew. His primary concern was his patients. For example, in 1986 plaintiff would see patients in the hospital beginning at 5:30 a.m., perform surgeries, see patients in the office, and make rounds at the hospital until 8 p.m. Ms. Gray performed the bookkeeping functions during this period, though plaintiff checked her work once or twice a month.

The Safeguard bookkeeping system consists of several documents which are used on a pegboard. The "day sheet" is a ledger on which each office receipt and disbursement is entered. A "patient card" is made for each patient. The patient card includes all charges and payments and is photocopied and used as a billing statement. When used properly, the patient card is placed over the day sheet on the pegboard and each entry on the patient card is carboned onto the day sheet.

The Safeguard bookkeeping system also includes the use of a deposit slip which is placed over the day sheet and the entry is then carboned onto the day sheet. Ms. Gray took the deposit slips with the checks to the bank. The checks were stamped with plaintiff's endorsement stamp. The stamp was used to endorse checks "for deposit only." Plaintiff did not sign his name on incoming checks and did not authorize Ms. Gray to do so.

From 1987 through 1993 plaintiff's accountant was Mark Milani. Plaintiff gave Mr. Milani the day sheets on a monthly basis. Plaintiff also gave Mr. Milani the day sheets, deposit slips, and check registers at the end of each year for preparation of plaintiff's financial statements and tax returns. Mr. Milani never discussed theft or embezzlement with plaintiff until discovery of the thefts by Ms. Gray.

When plaintiff opened his account with defendant, he signed an account card for a sole proprietor business account. The original signature card was held at defendant's main office in San Jose. Plaintiff did not have an account at defendant's Pruneyard office.

In March 1986, Ms. Gray began taking checks made payable to plaintiff and forging his signature on the back of the checks. She then took the checks to defendant's Pruneyard office and obtained cash for each check. None of defendant's employees ever questioned her about cashing plaintiff's checks. In order to conceal her thefts, Ms. Gray made accurate entries on the patient cards but did not allow the entry corresponding to the stolen check to be carboned onto the day sheet. Thus, the day sheet did not reflect the payment, but it did reflect a decreased balance corresponding to the stolen check. Plaintiff discovered the thefts in May 1989.

*Discussion*

I. *Evidence of Forgery*

■ Relying on the best evidence rule, defendant contends the trial court erred by allowing plaintiff to introduce copies rather than the originals of the forged checks. Plaintiff introduced into evidence copies of 63 checks totaling $58,000.

The best evidence rule is codified in Evidence Code section 1500.[2] It provides in relevant part: "Except as otherwise provided by statute, no evidence other than the original of a writing is admissible to prove the content of a writing."

However, in order to raise the issue of the admissibility of evidence, a party must make a timely objection on a specific ground. (§ 353, subd. (a).) Here defendant represented it was not asserting the best evidence rule in relation to the copies of checks that were produced in court. Accordingly, the issue has been waived.

■ Defendant next contends the portion of the judgment awarding plaintiff $25,040 in damages for checks whose existence and forgery plaintiff failed to prove must be reversed.

Here plaintiff did not have the originals or copies of several checks to substantiate a claim for $25,040. Over a defense objection based on the best evidence rule, the trial court allowed plaintiff to testify from reconstructed records that he rendered a service to various patients and had not received payment. Plaintiff testified that he initially compared the accounts receivable on the patient cards which was $102,550 to the accounts receivable on the day sheets which was $179,000 in order to obtain an estimate of the embezzlement. Plaintiff and his wife then compared each day sheet from

---

[2]All further statutory references are to the Evidence Code unless otherwise noted.

March 1985 through May 1989 with the patient cards. However, various patient cards, clinical records and the day sheets for 1988 were missing. In those instances, plaintiff consulted his pocket calendar in which he listed the patient's name and date of surgery. Thus, plaintiff attempted to reconstruct the exact amount which was embezzled. Plaintiff was able to obtain copies of both sides of checks from various insurance companies. However, Medicare refused to send any information on the basis that the transaction was privileged. Plaintiff did not serve a subpoena duces tecum on Medicare.

In order to substantiate his claim of $25,040, plaintiff relies on the following exception to the best evidence rule. Section 1505 provides: "If the proponent does not have in his possession or under his control a copy of a writing described in Section 1501 [copy of lost or destroyed writing], 1502 [copy of writing not otherwise reasonably procurable], 1503 [copy of writing not produced by opponent], or 1504 [copy of writing not closely related to issues], other secondary evidence of the content of the writing is not made inadmissible by the best evidence rule."

While section 1505 permits secondary evidence of the contents of a writing, it does not permit a party who has never seen the writing to testify to its contents. As one commentator has stated, "the witness must have personal knowledge of the original, whether he authenticates a copy or gives oral testimony of its contents. [Citation.]" (2 Witkin, Cal. Evidence (3d ed. 1986) § 942, p. 898.)

Several cases have acknowledged the requirement of personal knowledge. In *People* v. *Bizieff* (1991) 226 Cal.App.3d 1689 [277 Cal.Rptr. 678], the defendant was convicted of several counts of robbery. In one of the incidents, a woman associated with the defendant used a credit card stolen in a prior robbery. The employee who made the impression of the credit card showed a copy of the receipt to the investigating police officer. The officer wrote down the name impressed on the receipt and returned the receipt to the employee. The prosecution was unable to introduce either the credit card or the receipt at trial. On appeal, the defendant challenged the officer's testimony as to the name he had seen on the credit card receipt on the ground it violated the best evidence rule. The reviewing court held the testimony of one who had personally seen the credit card receipt was properly admitted. (See also *Posten* v. *Rassette* (1855) 5 Cal. 467, 469 [content of writing may be presented through testimony of "witnesses who had read the paper"]; *Nicholson* v. *Tarpey* (1899) 124 Cal. 442, 447 [57 P. 457] [testimony from witness who had never seen the written agreement or read it or heard it or heard it read "was clearly inadmissible"]; *Hedstrom* v. *Union Trust Co.* (1908) 7 Cal.App. 278, 286 [94 P. 386] [attorney who drafted lease may

testify to its contents]; *Creditors' Union* v. *Lundy* (1911) 16 Cal.App.567, 571 [117 P. 624] [contents of a document may be proved by "the recollection of a witness"].)

Here plaintiff's testimony was not based on his own observation of the forged checks and thus did not constitute "secondary evidence" as authorized by section 1505. Thus, the trial court committed prejudicial error in admitting this evidence. Without it, there was no evidence to support plaintiff's claim of $25,040. (See *Cambell* v. *Rice* (1913) 22 Cal.App. 734 [136 P. 512].)

## II. *Sufficiency of Evidence*

Defendant next contends there is insufficient evidence to support the jury's special verdict that plaintiff exercised ordinary care in his business. We disagree.

In considering this issue, a reviewing court must examine the record in the light most favorable to the respondent. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].) Thus, it must resolve all evidentiary conflicts and make all reasonable inferences in support of the judgment. (*Ibid.*)

Here there was substantial evidence that plaintiff exercised ordinary care in his business. In setting up his practice, plaintiff hired a consultant to advise him as to appropriate business procedures, including a bookkeeping system. Neither the consultant nor the Safeguard bookkeeping representative ever mentioned the possibility of embezzlement and how plaintiff could prevent it. Plaintiff also exercised due care in hiring. He received two favorable recommendations about Ms. Gray, including one from his then office nurse.

Defendant contends, however, that plaintiff failed to adequately supervise Ms. Gray. We disagree. Initially plaintiff was often in the office and would perform bookkeeping functions. As the number of his patients increased, plaintiff spent much less time on these functions. Thus, he reviewed her work once or twice a month. Mr. Milani, plaintiff's accountant, also reviewed Ms. Gray's work. He reviewed the day sheets in order to prepare tax returns and financial statements. The previous balance and the current balance entries were changed without reporting the receipt of the check and yet Mr. Milani never identified the embezzlement. Based on this evidence, we cannot conclude that plaintiff failed to adequately supervise Ms. Gray as a matter of law.

Defendant argues that plaintiff knew Ms. Gray needed money and yet he failed to ascertain that she would embezzle from him. However, the jury could also conclude that since Ms. Gray was borrowing money from plaintiff, plaintiff could reasonably believe that the loans met her financial needs.

Defendant also relies on *Menichini* v. *Grant* (3d Cir. 1993) 995 F.2d 1224, to support its contention of inadequate supervision. In *Menichini*, the plaintiff, a sole proprietor, filed an action for conversion against his bank to recover the amounts of checks which were embezzled by his former bookkeeper. The reviewing court found the plaintiff was negligent as a matter of law. As in the instant case, the bookkeeper was responsible for opening and receiving mail, sending invoices, and recording checks. Like Ms. Gray, the bookkeeper intercepted incoming checks payable to the plaintiff, forged his endorsement, and presented the checks to the bank for collection. In ascertaining which of two innocent parties should bear the burden where an employee converts funds, the *Menichini* court concluded that the plaintiff was in the best position to prevent the loss. However, the instant case is factually distinguishable from *Menichini*. Here plaintiff conducted a background check of Ms. Gary, sought professional advice as to the implementation of his bookkeeping system, reviewed her work, and submitted financial records to an accountant for review. More importantly, Ms. Gray presented the forged checks to defendant's tellers who never questioned her authority to cash plaintiff's checks. In contrast, the bookkeeper in *Menichini* deposited the checks through remote automatic teller machines.

### Cross-appeal

*Measure of Damages*

Plaintiff contends the trial court erred by excluding evidence of damages attributable to his efforts to determine his losses. He relies on Civil Code section 3336 which provides that damages for conversion of personal property may include "[a] fair compensation for time and money properly expended in pursuit of the property." However, California Uniform Commercial Code section 3420 limits damages to the face amount of the converted instrument. It provides in relevant part: "(a) The law applicable to conversion of personal property applies to instruments. . . . [¶] (b) In an action under subdivision (a), *the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of plaintiff's interest in the instrument.*" (Italics added.) Thus, the issue is whether the Civil Code or the California Uniform Commercial Code governs in the instant case.

California Uniform Commercial Code section 1103 states that "[u]nless displaced by the particular provisions of this code, the principles of law and

equity . . . shall supplement its provisions." The comment to this section states that "all supplemental bodies of law" must be given effect unless "they are explicitly displaced by this Act." (*Pearl* v. *General Motors Acceptance Corp.* (1993) 13 Cal.App.4th 1023, 1033 [16 Cal.Rptr.2d 805].)

The California Supreme Court interprets section 1103 to allow other statutes to supplement the Califronia Uniform Commercial Code "only if such principles [in other statutes] are not 'displaced by the particular provisions' of the Code." (*Sun 'N Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 696 [148 Cal.Rptr. 329, 582 P.2d 920].) The court further acknowledged that if the California Uniform Commercial Code "articulates a loss distributive scheme that applies to fact patterns such as alleged herein," then the California Uniform Commercial Code provision displaces any other provision of law. (*Ibid.*) Accordingly, we conclude the California Unform Commercial Code applies in the instant case and the trial court properly excluded evidence of amounts incurred in pursuit of the property.

Plaintiff, however, argues that comment 2 to California Uniform Commercial Code section 3420 establishes that it is limited to situations where there are multiple payees. The comment provides in relevant part: "The 'but' clause in subsection (b) addresses the problem of conversion actions in multiple payee checks."[3] Assuming that this clause refers only to the conversion of multiple payee checks, that interpretation does not alter the preceding clause. It states that "the measure of liability is presumed to be the amount payable on the instrument, . . . ." Thus, we interpret the statute as a whole to establish that in conversion actions involving negotiable instruments a defendant is liable for the amount payable on the instrument, but a plaintiff may only recover for that portion of the instrument in which he has an interest. Since no provision in the California Uniform Commercial Code allows for the recovery of damages for time and effort spent attempting to recover the converted property, the trial court did not err in excluding this evidence.

---

[3]The remaining portion of the comment reads as follows: "Section 3-110(d) states that an instrument cannot be enforced unless all payees join in the action. But an action for conversion might be brought by a payee having no interest or a limited interest in the proceeds of the check. This clause prevents such a plaintiff from receiving a windfall. An example is a check payable to a building contractor and a supplier of building material. The check is not payable to the payees alternatively. Section 3-110(d). The check is delivered to the contractor by the owner of the building. Suppose the contractor forges [the] supplier's signature as an indorsement of the check and receives the entire proceeds of the check. The supplier should not, without qualification, be able to recover the entire amount of the check from the bank that converted the check. Depending upon the contract between the contractor and the supplier, the amount of the check may be due entirely to the contractor, in which case there should be no recovery, entirely to the supplier, in which case recovery should be for the entire amount, or part may be due to one and the rest to the other, in which case recovery should be limited to the amount due to the supplier."

### Disposition

The portion of the judgment awarding plaintiff $25,040 in damages must be reversed. In all other respects, the judgment is affirmed.

Each party shall bear its own costs.

Bamattre-Manoukian, Acting P. J., and Wunderlich, J., concurred.