FIREMAN'S FUND INSURANCE COMPANY, Respondent, v BANK OF NEW YORK, Appellant.

First Department, March 30, 1989

APPEARANCES OF COUNSEL

*Robert G. Post* of counsel *(Hendler, Murray & Mait, P. C.,* attorneys), for respondent.

*Anne T. Schwab* of counsel *(Emmet, Marvin & Martin,* attorneys), for appellant.

## OPINION OF THE COURT

MILONAS, J.

Plaintiff-respondent Fireman's Fund Insurance Company, as insurer and assignee of Actors Equity, commenced this action to recover $100,000 from defendant-appellant The Bank of New York for allegedly making improper payment on four checks, each in the amount of $25,000. Actors Equity is an organization that represents some 37,000 stage actors and actresses. In December of 1982, its comptroller of 15 years, Ruth Zwiback, submitted notice of her imminent resignation and agreed to assist in the selection of a successor. The union thereafter decided that in searching for a new comptroller, it would utilize the services of various employment agencies, including Cris Associates. Actors Equity, consequently, advised Cris Associates of the qualifications which it sought in prospective applicants for the position, and the agency was expected to screen potential candidates, then describe their backgrounds to the union over the telephone in order to ascertain suitability in advance of any interviews. Actors Equity ultimately met with 12 applicants, not all of whom were referred by Cris Associates.

The individual whom the organization eventually hired was one of those referred by Cris Associates, Nicholas Scotti, who submitted an employment application, as well as a resumé, and also underwent what plaintiff describes as an extensive interviewing process. However, no investigative report was forwarded to Actors Equity by the agency nor was one requested, and, while it is true that, on a number of occasions, Scotti met with various officers of Actors Equity and was also questioned by the union's outside accounting firm, verification of his purported qualifications was limited to a single telephone call. Thus, the sole inquiry into Scotti's background involved a call placed by Zwiback to a number supplied by the candidate himself of someone who was supposedly employed by Paris Maintenance Company, Inc., whose comptroller Scotti claimed to have been. According to Zwiback, she made this telephone call simply to ascertain if Scotti worked well with

others, and she received a satisfactory reference from the person contacted.

Scotti was retained as comptroller on April 1, 1983 and was supervised by Zwiback until her departure on July 1, 1983. During this period, Scotti forged two of the checks which are the subject of the instant litigation. The two other checks were forged by him after he had received authorization to sign checks on the account of Actors Equity. All four checks were purportedly drawn by Gloria Crespo, secretary of the organization's Bonding Department, on the bonding account maintained at defendant bank and were payable to N. A. or N. Piscotti. Although other financial improprieties occurred while Scotti was comptroller, only these four checks are at issue herein. The forgeries of Crespo's signature were, by all accounts, professionally done, and Actors Equity did not discover the thefts for nearly a year. Moreover, there is no assertion that defendant was in any manner negligent in making payment on the checks, evidently because of the apparent genuineness of the signatures.

It was subsequently established that Scotti, whose real name is Nicholas Piscotti, had an extensive criminal history dating from 1968 and consisting, in part, of a series of convictions for grand larceny, petit larceny, forgery, possession of a forged instrument and possession of stolen property. In addition, Scotti's resumé seems to have been largely or entirely fabricated since he had never been employed in any capacity by Paris Maintenance Company, much less as its comptroller; there was no record that he had even worked for Investors Funding Corporation, another stated previous employer, and it was impossible to confirm whether he had worked for the Equitable Life Assurance Society of the United States between 1958 and 1965 as that company did not maintain its personnel files for more than 10 years. The one person with whom Zwiback had spoken was most likely simply a friend willing to vouch for Scotti. At trial, Zwiback testified that she had not checked out his personal references because "I just assumed it would be a waste of time to call."

In granting judgment in favor of plaintiff, the court concluded that "[i]t is well settled that, absent a drawer's negligence, a bank may not charge a drawer's account when it pays on a forged signature. Only where the customer was negligent and such negligence contributed to the forgery is the customer precluded from asserting the lack of authority against the bank", and herein Actors Equity, which had reasonably relied

upon the recommendation of Cris Associates, was not negligent. The court found that the possible negligence of Cris Associates in failing to validate Scotti's credentials could not be charged to Actors Equity in that defendant "has not met its burden of proving * * * one of the exceptions to the rule of non-liability for acts of independent contractors".

The law is settled that "ordinarily a drawee bank may not debit its customer's account when it pays a check over a forged indorsement" *(Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,* 57 NY2d 439, 444). As the Court of Appeals noted in *Spielman v Manufacturers Hanover Trust Co.* (60 NY2d 221, 224), "[i]n most cases, however, the forgery is not effective to transfer the instrument and the drawee is liable because it is in a position to detect the forgery before payment. Thus, in such cases it is the drawee, as between two innocent parties, who is accountable for the loss". Accordingly, "payments made on forged or unauthorized indorsements are at the peril of the bank unless it can claim protection upon some principle of estoppel" *(Gotham-Vladimir Adv. v First Natl. City Bank,* 27 AD2d 190, 192). In that connection, section 3-406 of the Uniform Commercial Code provides that: "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

The foregoing rule is based on the doctrine of equitable estoppel that " 'where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it' " *(National Safe Deposit Co. v Hibbs,* 229 US 391, 394; *see also, Bunge Corp. v Manufacturers Hanover Trust Co.,* 31 NY2d 223, 228). In *Brownlow v Aman* (740 F2d 1476, 1489), the Tenth Circuit aptly explained that "[t]he equitable maxim that where one of two innocent persons must suffer by reason of the fraud of a third person, the party whose act, omission, or negligence enabled the third person to consummate the fraud should bear the loss, is a fundamental theory upon which the Uniform Commercial Code rests." Applying this standard, the Supreme Court of Ohio determined that plaintiff company, by failing sufficiently to inquire into its employee's past work experi-

ences (the employee not only embezzled a substantial sum of money from plaintiff, but she admitted at trial that she had also been caught embezzling from a former employer), was precluded because of its own negligence from relying upon the employee's lack of authority against defendant banks, who were holders in due course (*G.F.D. Enters. v Nye*, 37 Ohio St 3d 205, 525 NE2d 10). Similarly, in *Commercial Credit Equip. Corp. v First Ala. Bank* (636 F2d 1051), the Fifth Circuit found plaintiff corporation to have been negligent as a matter of law when plaintiff's former employee, forger C. Mercer Jones, was hired under the following circumstances (at 1052-1053): "Jones' employment with Commercial originated when he was referred by an employment agency in early May 1978. Prior to that time he was unknown to the individuals at Commercial responsible for hiring, E. L. Norris, the assistant regional manager, and J. L. Stewart, the regional manager. Norris interviewed Jones on May 9, 1978, at which time Jones filled out a job application. After a second interview, conducted by Stewart, Jones was hired. Jones was not investigated by a credit bureau or credit reporting service, although it was Commercial's admitted standard practice to do so; he was not asked for credit references; no check was made of his creditors in Dothan, the city in which he previously had resided; and the personal references which he provided were not even contacted. The only inquiry made was to E. L. Gregory (Gregory), the manager of the Ford Motor Credit Corporation in Dothan, and Jones' former employer. The parties do not agree when Norris called Gregory, nor does either claim to recall the precise language of that conversation. We do not think either of those facts are particularly significant. What is important is that Gregory was not questioned in any way as to Jones' honesty or trustworthiness, nor was Gregory asked why Jones left his employment or if the company would rehire him. Had even such perfunctory inquiry been made, Norris would have discovered that Jones was forced to resign his position with Ford when they discovered him carrying out certain fraudulent practices against the company. Had Norris' inquiry gone further, he also would have discovered that Jones had carried out fraudulent schemes against the First Alabama Bank of Dothan. It was admitted that had Norris or Stewart possessed this information, Jones would not have been hired. Nonetheless, on May 15, 1978, Jones was hired to serve in a position of trust with Commercial."

The court in *Commercial Credit Equip. Corp. v First Ala.*

*Bank (supra)* further observed that this scenario, in conjunction with Commercial Credit's lax office procedure, showed that plaintiff was "an active participant in the activities that resulted in the forgery" (at 1056). Therefore, since it was undisputed that the payor bank had acted in good faith and that its normal practice of verifying the authenticity of signatures and endorsements was commercially reasonable, the bank was entitled to recoup from the plaintiff the amount which it had lost in negotiating Jones' check.

In the instant situation, regardless of whether or not the relationship of Cris Associates to Actors Equity can be deemed that of an agent or an independent contractor, the fact remains that the conduct of the union in retaining someone to manage many millions of dollars in funds without conducting, or insisting upon, a reasonable and trustworthy background investigation constitutes negligence substantially contributing to the making of the unauthorized signatures involved here. Certainly, Actors Equity may not avoid the consequences of its own omissions by claiming that it relied upon Cris Associates to properly screen applicants. The evidence at trial clearly demonstrates that Actors Equity never received nor even demanded a financial or security check of any of the candidates whose names were being forwarded by Cris Associates, much less of Scotti in particular, and then utterly failed to perform even the most cursory investigation of its own. Indeed, if Actors Equity had conducted even a perfunctory examination into Scotti's credentials, his deficiencies and unsavory history would have become glaringly obvious.

A simple telephone call to Scotti's purported previous employer, Paris Maintenance Company, whose controller he claimed to have been for the past 10 years, would have immediately exposed Scotti as an imposter. Actors Equity, however, neglected to undertake even this minimal step; instead, Zwiback merely contacted a person at the end of a telephone number furnished by Scotti himself, evidently a personal friend who had no association with Paris Maintenance Company. Moreover, there is no indication that the union ever considered, much less initiated, a standard credit bureau investigation or an inquiry with law enforcement authorities. Other than placing the one telephone call, Actors Equity took absolutely no action to probe into Scotti's background, references or qualifications before it hired him as its chief fiscal officer. Thus, Actors Equity basically accepted at face value an individual whom it put in charge of millions of

dollars of its funds. Such conduct was clearly negligent. Since plaintiff's loss herein was proximately caused by the negligence of Actors Equity *(see, Gotham-Vladimir Adv. v First Natl. City Bank, supra)*, and the bank paid on the forged instruments in good faith and in accordance with its reasonable commercial standards, defendant should not have been held liable on the four checks.

Therefore, appeal from the order of the Supreme Court, New York County (Eugene L. Nardelli, J.), entered on March 7, 1988, should be dismissed as superseded by the appeal from the judgment of May 11, 1988, without costs or disbursements.

Judgment of the Supreme Court, New York County (Eugene L. Nardelli, J.), entered on May 11, 1988, which, following a nonjury trial, awarded plaintiff the amount of $100,000, plus interest, costs and disbursements, should be reversed on the law, the judgment vacated and the complaint dismissed, with costs and disbursements.

SULLIVAN, J. P., Ross, KASSAL and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on May 11, 1988, reversed, on the law, vacated and the complaint dismissed. Appellant shall recover of respondent $250 costs and disbursements of this appeal. Appeal from order of said court, entered on March 7, 1988, dismissed as superseded by the appeal from the aforesaid judgment, without costs and without disbursements.