INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,

v.

AMERICAN DESERET LIMITED PARTNERSHIP, et al., Defendants.

No. 86 Civ. 1843 (MBM).

United States District Court, S.D. New York.

July 1, 1993.

Robert MCL. Boote, William A. O'Leary, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, Michael E. Cavanaugh, Winston & Strawn, New York City, for plaintiff.

I. Walton Bader, Bader & Bader, White Plains, NY, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Indemnity Insurance Company of North America ("IINA") guaranteed as surety in 1985 promissory notes (the "Notes") executed by defendants as limited partners in the proposed syndicated purchase of an Angus bull named High Voltage, and the sale of his semen for cattle reproduction. High Voltage proved less potent than his name, the venture failed, and the partners defaulted on the Notes. IINA paid the Notes, sued defendants, and now moves for summary judgment to collect the amounts it paid on

behalf of 12 of them.[1] Defendants have argued that they are not liable because they signed the Notes and certain additional documents with blank spaces relating to dollar amounts and other information, and that the Notes and other documents were filled in without defendants' authorization. For the reasons and to the extent set forth below, the motion is granted.

## I.

Leatherstocking High Voltage Limited Partnership was formed as a New York limited partnership to acquire the bull. Leatherstocking and its general partner, Liam Hutchinson, sought to raise capital by soliciting investors to buy limited partnership interests. Defendants were at least the intended if not the actual purchasers of limited partnership interests. Each of the 55 units of the limited partnership was priced at $100,000, payable by a $6400 cash contribution and a Note for the balance. The Notes were to be assigned to a bank as collateral for a loan to the limited partnership to buy the bull. To induce the bank to accept the Notes as collateral, Leatherstocking hired plaintiff IINA to guarantee payment of the Notes.

Each of the defendants affected by this motion signed a series of documents in connection with the transaction, with one exception as to defendant Wayne Epple as described below. The first of these was the Leatherstocking High Voltage Partnership Subscription Agreement, which provides in part as follows:

> You [the general partner] have also informed the undersigned that limited partnership interests in the Partnership are to be divided into 55 units ... and the purchase price for each unit ... is $100,000 and that each investor will be required to purchase a minimum of 1 unit, except for the purchase of half-Units which may be accepted at the discretion of the General Partner.
>
> \*    \*    \*    \*    \*    \*
>
> .... Execution of this Subscription Agreement shall constitute an offer by the undersigned to subscribe for the number of Units set forth below on the terms specified herein.
>
> \*    \*    \*    \*    \*    \*
>
> 6. *Revocation.* The undersigned will not cancel, terminate or revoke this Subscription Agreement or any agreement made by the undersigned hereunder and this Subscription Agreement shall survive the death or disability of the undersigned, except as provided below.

(Pl. App. Ex. B at 1, 7) The same agreement disclosed that each investor would have to pay $6400 in cash per unit, sign a Note for the balance of $93,600, and obtain a surety bond to collateralize what was in effect a loan to each investor. The agreement then stated that, "[f]or the convenience of the investor, the General Partner has made arrangements with a Surety Company to issue a Surety Bond to qualified investors." (*Id.* at p. 2)

The Note each defendant signed was styled a Security Installment Promissory Note, payable to the partnership Leatherstocking, and provided a payment schedule at an interest rate of 13% per year on the unpaid balance. (Pl. App. Ex. F)

The Surety Company was IINA, and each defendant signed also an Application Letter for a bond addressed to IINA. That letter recited the signer's understanding that IINA was not authorized to represent the partnership or its principals, was not a party to the "formation, promotion, financing, management or conduct of the Partnership," and had not made any "representations or recommendations to me with respect to the Investment, nor offered or given me any advice with respect to the advantages or disadvantages (financial, tax or otherwise) of the Investment...." (Pl. App. Ex. C at 1) The letter included a broad waiver of the signer's rights in the event IINA made any payment under the bond and sued to recover such payment:

> In the event you [IINA] make any payment pursuant to the Bond to the holder of

---

1. Those defendants are American Deseret Limited Partnership, Wayne Epple, Joseph C. Eyring, Joseph Garn Ford, Terry L. Foster, Gerald D. Huff, M.H. Michaelson, Michael Robbins Moore, Daniel B. Nickeson, Rodney B. Peterson, Republic Investments, Inc. and Ronald E. Stout.

my Promissory Note because of my failure to make payment of any principal or interest owing by me under my Promissory Note, you will be subrogated to all the rights of such holder and may commence any action or proceeding against me to collect all amounts due under my Promissory Note.

\* \* \* \* \* \*

I have no defense, set-off or counterclaim to the full and prompt payment of all indebtedness owing under my Promissory Note against you or any prior or subsequent holders thereof. In consideration for your issuance of the Bond, I hereby waive any right to assert any defense, set-off or counterclaim in any action or proceeding commenced against me under by Promissory Note or Indemnity Agreement.

(*Id.* at 2) The letter ended with the following paragraph:

THIS WILL FURTHER CONFIRM THAT I HAVE BEEN GIVEN AMPLE OPPORTUNITY TO REVIEW THIS LETTER AND ALL BOND DOCUMENTS WITH COUNSEL OF MY CHOICE AND I AM SATISFIED THAT I HAVE A COMPLETE UNDERSTANDING OF THIS LETTER AND SUCH DOCUMENTS.

(*Id.* at 3)

Further, each defendant signed an Indemnification and Pledge Agreement acknowledging his awareness that the bond to be issued by IINA would require payment upon default regardless of whether the defaulting defendant had good defenses against the partnership, and continued:

Accordingly, investor must indemnify Surety under this Agreement for any amount that Surety is required to pay under the Bond, as well as any other amount paid or incurred by Surety as set forth herein.

(Pl. App. Ex. D at 1–2)

Finally, each defendant executed an Estoppel Letter "intended to be for the benefit of any commercial bank or lending institution that may at any time hereafter become the holder of [the investor's] note." (Def. App. Ex. E) The letter also acknowledged that the signer's obligation to repay the Note "shall be absolute and unconditional." (*Id.*)

As explained more fully below, defendants contend that the blanks in these documents were filled in at the closing of the transaction on August 30, 1985. Leatherstocking, the original payee, endorsed the Notes to Interdiscount Limited, which in turn endorsed them to Barclays Bank. IINA executed bonds which guaranteed payment of the Notes to the holder thereof if defendants defaulted. Those bonds included the following provision:

This bond constitutes a primary obligation of the Surety [IINA], is irrevocable, absolute and continuing and as to any Permitted Assignee will remain in full force and effect until the Notes have been paid in full regardless of any illegality, invalidity, unenforceability of or and [*sic*] defect in any provision of the Notes or accompanying loan documents.

(Pl. App. Ex. G at 5) When defendants defaulted, Barclays, the holder of the Notes, notified IINA of each default and IINA made the payments as required by the bonds. (Pl. App. Ex. H) In January 1989, after this action was filed, IINA prepaid the balance on the Notes and received an assignment of the Notes from Barclays. (*Id.*)

## II.

Plaintiff moved initially for summary judgment in 1989. After numerous delays to accommodate the schedule of defendants and their counsel, that motion was denied on December 27, 1990. However, a Rule 43(e)[2] hearing was scheduled for December 4, 1991 to evaluate defendants' claims that the Notes were materially altered. Three defendants attended and testified at the hearing; five others have been deposed either before or since. The scheduling order that directed the hearing, dated October 8, 1991, provided in part: "Judgment will be entered against

---

**2.** That Rule provides in relevant part that, "When a motion is based on facts not appearing of record ... the court may direct that the matter be heard wholly or partly on oral testimony or deposition." Fed.R.Civ.P. 43(e).

any party failing to appear." The substance of the testimony of those defendants who appeared, and the facts relating to the other four defendants to the extent they are of record, based on pleadings and answers to interrogatories, are set forth below.

### 1. *American Deseret Limited Partnership*

This defendant did not appear at the hearing nor was a representative of this defendant deposed. From interrogatory answers submitted in behalf of this defendant, it appears that on August 21, 1985, the directors of this defendant's corporate general partner, American Deseret Corporation, passed a resolution in part as follows:

> RESOLVED, that American Deseret Limited Partnership subscribe for limited partnerships in the Leatherstocking High Voltage Partnership of American Cattle Management Corporation.
>
> IT IS FURTHER RESOLVED, that Glen V. Bingham, Vice President be empowered to sign on behalf of American Deseret Limited Partnership and to submit all of the necessary documents required to complete the arrangement for the limited partnership.

(Pl. App. Ex. I) Bingham then signed the Note in the amount of $93,600, and the Indemnification Agreement, in behalf of the partnership. (*Id.*) In his answers to interrogatories, Bingham claimed that there were blanks in the documents he signed, including as to dollar amount. He suggested as well that the phrase "Pay to the order of" did not appear in the Note, and therefore that it was not a valid negotiable promissory note. Alternatively, if the phrase did appear in the Note, he claimed that because he is not a lawyer he did not know that that phrase made the Note negotiable. He does not deny, however, that language in the Note provided for liability of later endorsers. (*Id.*) That language would notify a reader that the instrument was subject to further negotiation—*i.e.*, that it was negotiable.

### 2. *Wayne Epple*

Wayne Epple conceded at his deposition that he had signed the Note (Pl. App. Ex. K at 51), the Indemnification Agreement (*Id.* at 48–49), the Application Letter (*Id.* at 50) and the Estoppel Letter (*Id.* at 52), all with blanks. He denied that the signature on the Subscription Agreement was his (*Id.* at 63), but said he recalled seeing that agreement in a package of executed documents he received on September 25, 1985. (*Id.*) The amount of his Note was $46,800. (Pl. App. Ex. J) He testified that he thought the documents would be returned to him for his approval, or there would be no investment, although he testified also that he had decided to invest or he would not have signed the documents. (Pl. App. Ex. K at 24, 21) Epple was president of a mining company and was licensed to sell securities in Utah. (*Id.* at 5, 7)

### 3. *Joseph C. Eyring*

In his answers' to interrogatories, Joseph C. Eyring conceded that he had signed the Note and the Indemnification Agreement, albeit with blanks in them. (Pl. App. Ex. L) Eyring also conceded at his deposition on January 9, 1992 that he had signed the Subscription Agreement (Eyring Dep. 10–12) The amount of his Note was $93,600. He testified as well that it was "stupid on my part to ever sign anything that wasn't completely filled out," and added that, "I'm a realtor for forty years, and I certainly know better than to sign blank notes and pass them out." (Pl. App. Ex. M at 37)

### 4. *Joseph Garn Ford*

At the December 4, 1991 hearing, Joseph Garn Ford testified that he signed the Note and the Indemnification Agreement. (Pl. App. Ex. O at 12–13) He testified that although he signed the Note, he believed that "there would be a guarantee of non-recourse insurance or guaranteed bond that the note would never be called." (*Id.* at 15) In response to questions from the Court, Ford testified that he knew the documents would be presented to a third party to obtain financing (*Id.* at 44–45), but testified also that he believed "there would be nothing in force until after my approval." (*Id.* at 41) He could not explain why he signed blank documents that were to have no effect until he later approved them. (*Id.* at 47) He added, "I know this sounds stupid. I was very naive

about it." (*Id.* at 48–49) Ford's Note is in the amount of $46,800. (Pl. App. Ex. N) Ford is a dentist. (12/4/91 Tr. 18)

### 5. *Terry L. Foster*

In both his answers to interrogatories (Pl. App. Ex. P) and in testimony at the hearing, Terry L. Foster conceded that he had signed the Note, the Indemnification Agreement and the Subscription Agreement. (Pl. App. Ex. Q at 83–85, 95) He said he was induced to sign the documents in blank by his employer, Bruce Furst of Furst Holding Corporation (and Gipe, Foster and Furst), apparently an investment promoter, who "needed valid investors in order to show the bank he had investors that could qualify for the minimum amount of the investment." (*Id.* at 85–86) He acknowledged that his signature on the Subscription Agreement meant he had agreed to purchase at least one unit (*id.* at 95), and the amount of his note was $93,600. (Pl. App. Ex. P) He testified in part as follows in response to questions from the Court:

Q. Your understanding was that you were not going to have any obligation whatever on these documents, and I understand that's the net of what you testified about here, right?

A. Yes, sir.

Q. What was supposed to be the significance of the fact that you signed them?

A. The fact that Mr. Furst could go back and represent that he had a significant number of investors, significant enough to qualify for the minimum to close the financial obligation. He would then—if mine was needed, substitute me out with other qualified people that he was talking to.

Q. You are saying if yours was needed, it wouldn't be needed, right?

A. Eventually. It would be needed for the closing, but it would be subbed out.

Q. Are you telling me it was your understanding you were going to fool—he was going to fool the bank?

A. I don't think he was trying to fool the bank. He was caught in a situation of timing. The bank told them they were going to close out this partnership and not

allow it to fund if they didn't meet certain parameters within a certain time frame.

Q. One of those parameters was that they needed investors, correct?

A. Correct.

Q. You were going to help him avoid that problem by showing them that you were willing to invest, although in fact you were not willing to invest, is that your testimony?

A. Correct.

Q. You understood he was going to tell them that you were willing to invest even though you were in fact not willing to invest?

A. Correct.

(Pl. App. Ex. Q, 107–08)

### 6. *Gerald D. Huff*

This defendant did not appear at the Rule 43(e) hearing, nor was he deposed. Judgment may be entered against him pursuant to the October 8, 1991 scheduling order cited above. Moreover, in his answers to interrogatories he admitted signing the Note and the Indemnification Agreement, which allegedly omitted the same information as has been described in the testimony and interrogatory responses of other defendants. (Pl. App. Ex. R) The amount of his Note was $46,800.

### 7. *M.H. Michaelson*

M.H. Michaelson has conceded that he signed the Note and the Indemnification Agreement (Pl. App. Ex. S) as well as the Subscription Agreement. (12/4/91 Tr. 64–66) Michaelson's Note was in the amount of $46,800. He testified also that he has been a registered securities broker, and has sold insurance. (*Id.* 58–59) Michaelson's professed understanding of the transaction mirrors that of other defendants:

A. I was told that the note needed to be signed.

THE COURT: Who told you that?

THE WITNESS: Michael W. Howery. I was told that under no circumstances would that note be filled in by anyone else but me. That it would go back, be evaluated, it would come back to me, and then I

could fill it out for what I wanted to do, if anything.

(*Id.* at 52) His responses to questions from the Court as to the meaning of the procedure he described also were similar:

> Q. What was the point of having them signed in blank if all that was going to be shown to the general partner was a note in blank with a signature on it?
>
> A. I can't answer that question.
>
> Q. Did it occur to you at the time to ask that question?
>
> A. Yes, it seemed that this was a very irregular procedure.
>
> Q. It did?
>
> A. Yes. I did not really like to do that, but they absolutely assured me that these would come back and I could fill them in myself along with having the guarantee nonrecourse note.

(*Id.* at 81) The alleged assurances came from Michael Howery, who was associated with the sponsors of the failed venture, not with plaintiff or any entity from which plaintiff derives its rights. (*Id.*) Michaelson said he had signed the documents because he was "stupid," and said he was "a very gullible and trusting person." (*Id.* at 51, 81)

## 8. *Michael Robbins Moore*

This defendant conceded at his deposition and in his answers to interrogatories that he had signed the various subscription documents, including the Note and the Indemnification Agreement (Pl. App. Ex. W at 41, 44, 48–49); (Pl. App. Ex. V) The amount of his Note was $93,600. Although Moore testified that he was an investor who was familiar with limited partnership transactions (Pl. App.Ex.W at 14), he testified that even though the Note imposed liability on him it was his understanding that the general partner, Liam Hutchinson, would be responsible for repayment. (*Id.* at 24) He said he and his fellow investors had signed the partnership documents "like dopes." (*Id.* at 26)

## 9. *Daniel B. Nickeson*

Daniel B. Nickeson testified at his deposition that he had substantial experience as an investor, including as an investor in limited partnerships. (Pl. App. Ex. Y at 9) He conceded at his deposition that he had signed the Note, the Subscription Agreement and the other documents relating to the investment. (*Id.* at 27–28, 36, 44, 47, 50, 68, 72; Pl. App. Ex. X) The amount of his Note was $93,600. Nickeson said he had spoken to Hutchinson by telephone during the closing, knew that Hutchinson had completed the Note, and authorized Hutchinson to complete the Note for up to two units, or $200,000. (Pl. App. Ex. Y at 86–89)

## 10. *Rodney G. Peterson*

Rodney G. Peterson did not appear at the hearing and apparently was not deposed. He too is subject to judgment by default. Moreover, he said in his answers to interrogatories that he had signed the Note and the Indemnification Agreement in incomplete form, in much the same manner as other defendants. (Pl. App. Ex. Z) The amount of his Note was $46,800.

## 11. *Republic Investments—Michael W. Howery*

At his deposition, Michael W. Howery testified that he owned defendant Republic Investments, Inc., but said that at the time of the Leatherstocking investment Republic was not a "current corporation." (Pl. App. Ex. BB) He said both at his deposition and in his answers to interrogatories that he had signed the Note and other documents on behalf of Republic (*Id.* at 73–74, 77–80), whose Note was in the amount of $187,200. He said he understood that the reason for signing the documents was as follows: "[I]n order for Mr. Hutchinson, the general partner, to obtain the financing, he had to be able to show the bank or the financing company that he had good clients and could qualify for financing and that the program could be filled out." (*Id.* at 27) He said he understood that the general partner would guarantee repayment of the Notes, but never saw any writing to that effect. (*Id.* at 29–30). He conceded that he had advised other investors who were his clients to sign the documents based on that understanding, even though he had never seen any transactions in which the obligations of limited partners

528

were released. (*Id.* at 35) He confirmed that he gave Brian Burry authority to complete at the closing the Notes and other documents on behalf of his company and clients. (*Id.* at 50)

### 12. *Ronald E. Stout*

This defendant was never deposed and is deceased. By order dated July 17, 1992, his widow was substituted as the presumptive executrix of his estate. However, he did sign answers to interrogatories in which he admitted having signed the Note and other documents, but claimed he signed them in blank with the understanding they would have no effect unless he gave further authorization. The amount of his Note was $187,200.

Defendants have submitted as well the affidavits of Declan O'Donnell, a Colorado lawyer, and Brian Burry, a California resident. O'Donnell, although his affidavit does not disclose it, was counsel to an entity that helped promote the limited partnership interests in question here and, according to defense counsel, had said at an earlier stage of this litigation that he would invoke his Fifth Amendment rights if called to testify or to submit an affidavit in this case. (Bader 6/21/90 Aff. ¶ 4 and 8/27/86 letter of O'Donnell attached thereto) He avers in his affidavit that plaintiff was "fully aware of the irregularities involved." (O'Donnell 5/30/91 Aff.) The basis for this averment appears to be his further disclosure that, as several defendants also have averred, documents were signed in blank and completed at the closing, in part by an attorney named Jack Cohen, who O'Donnell states was representing plaintiff. He also refers to some documents being "changed," but does not disclose in what respect they were changed. Neither the testimony of the defendants affected by this motion, nor their interrogatory responses, suggest that any documents were "changed," as opposed to simply being completed, in any way that is material to the claims in this case.

Burry, a California real estate developer, avers that he wished to raise money for a real estate venture but was told by a representative of Interdiscount, Inc., that before funds could be raised for his project he would have to help sell the Leatherstocking venture. Burry is conspicuously silent as to what he did to help promote the Leatherstocking venture, but does state that he was present at the closing and saw various persons, including one who was allegedly a representative of plaintiff, fill in blank spaces in documents that had been previously signed. (Burry 8/27/91 Aff. ¶¶ 18, 21) He does not specify who filled in which blank spaces.

### III.

Summary judgment should be granted under Fed.R.Civ.P. 56(c), if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, the mere existence of disputed issues of fact is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Only disputes over facts that might affect the outcome of the suit under the governing law will properly bar entry of summary judgment. "[S]ubstantive law will identify which facts are material. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The disputed factual issues must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 57 (2d Cir.1987); *Samsung America, Inc. v. M/T Fort Producer,* 798 F.Supp. 184 (S.D.N.Y.1992). However, when the non-moving party relies on circumstantial evidence to generate inferences that the moving party engaged in conduct that makes no

economic sense, the non-moving party must come forward with more persuasive evidence than would otherwise be necessary in order to survive a summary judgment motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir.1989) (Easterbrook, J.).

### A.

■ Here, the controlling substantive law is New York's Uniform Commercial Code ("UCC"). IINA claims that it is a holder in due course of the Notes pursuant to UCC § 3–302:

> (1) A holder in due course is a holder who takes the instrument
>
> (a) for value; and
>
> (b) in good faith; and
>
> (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

N.Y.U.C.C. § 3–302 (McKinney 1991). IINA claims holder in due course status, pursuant to the so-called shelter provision of UCC § 3–201, as a transferee of Barclays, which IINA argues was itself a holder in due course. Section 3–201(1) provides that

> (1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

Section 3–201(1) "permits a transferee who was not a prior holder to assert the rights of its transferor even if the transferee knew that the making of the instrument was induced by fraud." *National Union Fire Ins. Co. v. Woodhead*, 917 F.2d 752, 757–58 (2d Cir.1990); *Fidelity Bank, N.A. v. Avrutick*, 740 F.Supp. 222, 235–36 (S.D.N.Y.1990). Therefore, if Barclays was a holder in due course, IINA as a transferee of Barclays is automatically a holder in due course unless it was itself a party to fraud or illegality affecting the Notes.

There is no genuine issue of fact as to the status of Barclays, and therefore IINA, as a holder in due course. As stated above, Leatherstocking, the original payee, endorsed the Notes to Interdiscount Limited, which in turn endorsed them to Barclays. Defendants rely on the Burry affidavit which states that a Barclays representative and an IINA representative participated at the closing in the filling of blanks on documents defendants had signed. UCC § 3–304(1)(a) provides that a purchaser is on notice of a claim or defense if "the instrument is so incomplete ... or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay." N.Y.U.C.C. § 3–304(1)(a).

However, Barclays and IINA do not have notice of such "irregularity" merely because their representatives participated at the closing. UCC § 3–304(4)(d) covers this precise situation, and it squarely contradicts defendants' position. Section 3–304(4) provides specifically as follows:

> (4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim ...
>
> (d) that an incomplete instrument has been completed, unless the purchaser has notice of any improper completion.

N.Y.U.C.C. § 3–304. The Official Comment to Section 3–304 includes the following:

> 10. Paragraph (d) of subsection (4) [quoted above] follows the policy of the original Section 14, under which any person in possession of an instrument has prima facie authority to fill in blanks. It is intended to mean that the holder may take in due course even though a blank is filled in his presence, if he is without notice that the filling is improper.

N.Y.U.C.C. § 3–304, Comment 10. Section 3–304(7) provides further that:

> In any event, to constitute notice of a claim or defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith.

N.Y.U.C.C. § 3–304(7). There is no evidentiary showing here that Barclays acted in bad

faith. If filling in of blanks is presumptively valid, as Section 3–304 provides, there is no reason why the participation of a Barclays or an IINA representative in that activity, if either did participate in it, in and of itself shows bad faith.

Although defendants point to other facts known to the participants in the closing, such as that some of the Notes were dated a day before the closing or that some of the Notes had amounts filled in by hand whereas other information was typed, there is nothing in such facts to suggest irregularity. It is not irregular for documents to be filled in and then sent by overnight delivery service, nor is lack of uniformity equivalent to or suggestive of irregularity.

■ When an instrument is signed in blank "it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed." N.Y.U.C.C. § 3–115(1); *see In re Gas Reclamation, Inc. Sec. Litig.,* 741 F.Supp. 1094, 1103 (S.D.N.Y.1990); *Fulton County Nat'l Bank & Trust Co. v. Fulton Auto Corp.,* 114 A.D.2d 706, 494 N.Y.S.2d 543 (3d Dep't 1985). One who signs a note with obvious blanks is liable to a holder in due course of the note, according to the terms of the note after the blanks have been filled, on the doctrine of implied authority. *See, e.g., Nat'l Exchange Bank v. Lester,* 194 N.Y. 461, 87 N.E. 779 (1909); *Wyerhauser v. Dun,* 100 N.Y. 150, 2 N.E. 274 (1885); *Chelsea Exchange Bank v. Warner,* 202 A.D. 499, 195 N.Y.S. 419 (1st Dep't 1922); *Rutherford Nat'l Bank v. Nichols,* 102 N.Y.S.2d 658 (Sup.Ct.Queens Cy.1951). According to a recent case involving this plaintiff, even an instrument which is "signed while still incomplete and later completed *without authority* ... is enforceable by a holder in due course." *Equilease v. IINA,* 183 A.D.2d 645, 584 N.Y.S.2d 793, 794 (1st Dep't 1992) (emphasis added); *see* N.Y.U.C.C. § 3–407(3) ("when an incomplete instrument has been completed, [a subsequent holder in due course] may enforce it as completed"). "[T]he burden of establishing that any completion is unauthorized is on the party so asserting." N.Y.U.C.C. § 3–115(2); *Fulton County Nat'l Bank & Trust Co. v. Fulton Auto. Corp.,* 494 N.Y.S.2d at 544.

The holder in due course doctrine is of particular importance in commercial transactions such the one at issue here, because that doctrine "has as its objective encouraging and facilitating the ready transaction of negotiable instruments, central to our credit economy...." *Hartford Accident & Indemnity Co. v. American Express Co.,* 74 N.Y.2d 153, 158, 542 N.E.2d 1090, 1092, 544 N.Y.S.2d 573, 575 (1989). The Supreme Court long has recognized that "[t]ransactions of a commercial nature extend throughout the civilized world [and] uniformity of decision is a matter of great public convenience and universal necessity." *Railroad Co. v. Nat'l Bank,* 102 U.S. 14, 57–58, 26 L.Ed. 61, 77 (1880). Here, there is particular reason not to draw the strained inferences proffered by defendants. Barclays was putting up money in return for these Notes; IINA was providing insurance on which it ultimately made good. It makes no economic sense that Barclays and IINA would have put their assets at risk in return for the prospect of then seeking a partial or nil recovery, Barclays from IINA and IINA from these defendants. To put it another way, they had no apparent reason to dig a hole for themselves so that they could then try to jump out of it. The uncontradicted testimony of Norman E. Rogers, Esq., the Barclays officer in charge of this transaction and himself a lawyer, shows that Barclays did no such thing. (Pl. App. Ex. FF at 23, 30, 32–33)

### B.

■ Even assuming without deciding that Barclays was not a holder in due course, these defendants, each of whom admitted at the least to having signed Notes and other documents in blank, are barred by the UCC and common law principles from asserting that the Notes and other documents were completed without their authority, absent evidence that IINA was an active participant in fraud.

Section 3–406 of the UCC provides as follows:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from

asserting the alteration or lack of authority against the holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. N.Y.U.C.C. § 3–406. That rule "is based on the doctrine of equitable estoppel that 'where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it.'" *Fireman's Fund Ins. Co. v. Bank of New York,* 146 A.D.2d 95, 98, 539 N.Y.S.2d 339, 341 (1st Dep't 1989) (quoting *National Safe Deposit Co. v. Hibbs,* 229 U.S. 391, 394, 33 S.Ct. 818, 819, 57 L.Ed. 1241 (1913)). The same court quoted with approval the following observation from *Brownlow v. Aman,* 740 F.2d 1476, 1489 (10th Cir.1984):

> The equitable maxim that where one of two innocent persons must suffer by reason of the fraud of a third person, the party whose act, omission, or negligence enabled the third person to consummate the fraud should bear the loss, is a fundamental theory upon which the Uniform Commercial Code rests.

In this case, there is no evidence to support the inference that IINA was an active participant in the fraud allegedly perpetrated on defendants. Indeed, as suggested above, it is ridiculous to suppose that IINA knowingly would have put itself in the position of insuring a fraudulent transaction and incurring an obligation for which it would then have to seek reimbursement from individual defendants. Moreover, defendants' purported defense—that the Notes were intended to be used only to obtain financing, essentially by fooling the bank—itself suggests their own willing participation in a fraud. Defendants are estopped to assert lack of authority in completing the Notes as a basis for denying recovery to IINA, their own inattentiveness having placed IINA in the position of incurring an obligation in connection with the Notes.

### IV.

There remains the issue of the amount of plaintiff's recovery. On this record, there is no evidence that any of these defendants knowingly obligated himself or itself for more than the value of one unit, that being the presumptive minimum subscription of each limited partner as set forth in the Subscription Agreement. (See p. 523, *supra*) Accordingly, as to those defendants whose Notes reflect the cost of one unit—$100,000—or less, summary judgment is granted in the amount of the Note less the amount actually paid. As to those defendants whose Notes reflect amounts exceeding the cost of one unit, recovery will be limited to the cost of one unit less amounts actually paid.

Settle judgment on 10 days' notice.

SO ORDERED.